(S:\04cv0694.opn.wpd)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **STEVEN SMITH,** | : | **Case  No. 1:04-CV-694** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **vs.** | : | |
| | : | |
| **MARGARET BRADSHAW, Warden,** | : | **OPINION & ORDER** |
| | : | |
| **Respondent.** | : | |

Steven Smith petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Smith challenges the constitutional sufficiency of his conviction by a jury for aggravated capital murder, and also challenges the constitutionality of the imposition of a sentence of death.

For the reasons set forth below, Smith's petition for a writ of habeas corpus is **DENIED**.

## I.  PROCEDURAL HISTORY

On November 5, 1998, Smith was indicted on two counts of aggravated murder pursuant to Ohio Revised Code § 2903.01(C)(purposeful killing of a child under the age of 13) and Ohio Revised Code § 2903.01(B)(felony murder). Both counts contained the specifications that the aggravated murder was committed while Smith was committing or attempting to commit rape, or fleeing immediately after committing or attempting to commit rape, that the murder victim was under the age of 13 at the time of the murder and Smith was the principal offender in the murder, that the murder was committed with a sexual motivation, and that Smith was a sexually violent predator.  Smith pleaded not guilty to all

counts and specifications in the indictment.

Represented by trial counsel Robert H. Whitney and Bernard R. Davis, Smith's trial commenced on March 8, 1999.  The jury convicted Smith of all counts in the indictment and found him guilty of the sexual motivation specification. After the mitigation phase of trial, the jury recommended that Smith be sentenced to death on March 20, 1999.  The trial court merged the two aggravated murder specifications and sentenced Smith to death on March 25, 1999.[1]

Smith filed a notice of appeal to the Ohio Supreme Court on May 10, 1999.  The Ohio Supreme Court held briefing in abeyance for thirty days and remanded the matter to the trial court "for an election of which aggravated murder count the appellant is sentenced on." (Doc. No. 18, at 45).  On January 5, 2000, the trial court responded that it had sentenced Smith on the felony murder count only.  Smith thereafter filed an appellate brief raising twenty propositions of law.  On December 13, 2002, the Ohio Supreme Court affirmed Smith's convictions and sentence.  State v. Smith, 780 N.E.2d 221 (Ohio 2002).  Smith's direct appeal concluded on June 2, 2003, when the United States Supreme Court denied his petition for a writ of certiorari.  Smith v. Ohio, 539 U.S. 907 (2003).

Prior to the conclusion of his direct appeal, Smith filed a petition for post-conviction relief.  He filed an amendment to the petition on September 1, 2000.  Finding no grounds on which to grant relief, the post-conviction court denied Smith's petition.  In that opinion, the court also denied Smith leave to file an amendment to the post-conviction petition, but nevertheless ruled on the claims contained in the amendment.

---

[1]	Upon the State's motion, the trial court dismissed the sexual predator specification after the sentencing phase of the trial.

Smith appealed the post-conviction court's decision to the Fifth District Court of Appeals.  That

court affirmed the denial of post-conviction relief on July 20, 2001.  Smith thereafter appealed to the

Ohio Supreme Court, filing a memorandum in support of jurisdiction.  On January 29, 2003, the Ohio

Supreme Court dismissed Smith's discretionary appeal as not involving any substantial constitutional

question.  State v. Smith, No. 01-1572, slip op. (Ohio Jan. 29, 2003).


## II.  FACTUAL HISTORY

On appeal, the Ohio Supreme Court set out the factual history of this case, as revealed by the

evidence adduced at Smith's trial.  The facts surrounding the underlying incident are as follows:

> In April 1998, defendant-appellant, Steven Smith, met and started dating Keysha Frye.
> A short time later, Smith moved in with Frye and her two young daughters, Ashley, age
> two, and Autumn, six months. In the middle of September 1998, Frye asked Smith to
> move out due to his heavy drinking. However, Smith moved back in after he promised
> Frye that he would stop drinking. Around this same time, Smith was fired from his job
> and began watching Frye's children while she was at work.
>
> On September 28, 1998, Frye arrived home from work at 2:30 p.m. According to Frye's
> account of what occurred that afternoon and evening, she and Smith left the apartment
> with her two children. They ran some errands, ate dinner at Burger King, and visited one
> of Smith's friends, Brett Samples. While visiting Samples, Smith drank three beers and
> played pool. They left Samples's home at 7:30 p.m. On the way home, Smith purchased
> a twelve-pack of Busch Ice at a gas station and drank one of the beers in the car.
>
> Upon arriving home around 8:00 p.m., Frye locked the apartment's two outer doors.
> Smith changed Autumn's diaper, fed her, and dressed her in a pink sleeper. At around
> 10:15 p.m., Smith took Autumn upstairs and put her to sleep in her crib. Frye put Ashley
> to bed at 10:30 p.m. Frye went back downstairs and watched television with Smith, who
> drank more beer. Shortly thereafter, she and Smith went upstairs. Smith removed his
> cutoff shorts and red underwear, and they had sexual intercourse. Smith did not
> ejaculate, but Frye stated that he did not seem upset.
>
> Frye and Smith then went back downstairs, watched more television, and Smith
> consumed more beer. Frye went upstairs to sleep at 11:00 p.m., while Smith remained

-3-

downstairs watching television. Frye checked in on her children and brought Ashley into her bed to sleep with her. Frye left Autumn in her crib. At around 3:22 a.m. on September 29, 1998, Frye was awakened by Smith, who was standing next to her bed, naked. Smith placed Autumn, who was also naked, down beside Frye in bed. Frye went to pick Autumn up and noticed that Autumn's head fell over her arm. She then placed her hand on Autumn's stomach and realized that the baby was not breathing. Frye told Smith that he had killed her baby. In response, Smith threw the alarm clock and said that the baby was not dead.

Frye quickly left the apartment with Autumn and Ashley and went to the apartment of neighbors Mya Brooks and Jeff Pierce. Brooks testified that when she opened the door, Frye screamed, "[H]e killed my baby, he killed my baby, Mya, help me." Frye entered the apartment with her children, and Brooks called 911. Before the ambulance arrived, Smith came to Brooks's door, asked what Frye was doing, and exclaimed that "he didn't do anything" and "why was she fucking lying." Brooks shut the door on Smith.

Emergency medical personnel arrived and discovered Autumn's nude, lifeless body lying on a blanket. They observed injuries on her head and bruising around her eyes. They began CPR, and Autumn was transported to the hospital. The emergency room doctor testified that upon her arrival, Autumn had no pulse and had suffered a retinal hemorrhage. In addition to her visible bruising, the physician also stated that Autumn had bruising around her rectum and that the opening of her vagina was ten times the normal size for a baby her age-injuries that are consistent with sexual abuse. After trying to resuscitate Autumn for close to an hour, medical personnel pronounced her dead.

In the meantime, shortly after EMS arrived at the scene, Pierce observed Smith throw a trash bag in a dumpster. He heard Smith say that he did not do anything and that he was leaving. Pierce told Smith to stay with him, which he agreed to do.

Soon thereafter, the police arrived at the crime scene. Officers entered Frye's apartment and saw no signs of forcible entry. They found that the television had been left on and was extremely loud. Police also discovered the victim's pink baby sleeper under the coffee table and Smith's cutoffs and jeans near the couch. They also found whitish-colored material, later determined to be pieces of shredded diaper, scattered on the floor in the same area near the baby swing and sofa. Small piles of the victim's hair were found on the coffee table. The police also retrieved a garbage bag from the outside trash dumpster that contained a torn baby diaper, Smith's tee shirt, and ten empty cans of Busch Ice.

Officer Joseph Dean Petrecky approached Smith, who was standing outside the apartment. Before asking him any questions, Smith told the officer, "I didn't do it, I didn't do it." Smith smelled of alcohol, was disheveled, and swayed back and forth while speaking with the officer. The officer arrested Smith for public intoxication. Later that

-4-

morning, at 11:00 a.m., Smith's blood-alcohol level was tested and found to be .123.

At the police station, Detective Robert Burks interviewed Smith. He told the detective that he had drunk four beers during the entire day and night. He stated that he and Frye had gone to bed at midnight and that he was awakened by Frye, who was accusing him of killing her daughter. On October 27, 1998, Smith gave police a second statement. In that statement, he changed his version of what had occurred. He told police that he had consumed three beers at Samples's house and six additional beers when he returned to the apartment. Smith said that later that evening, after they had returned home, they put Autumn to sleep in the baby swing and Ashley to sleep on the downstairs love seat. Smith also said they had had sexual intercourse on the living room couch while the two children were asleep in the same room. According to Smith, he woke up at 3:25 a.m. and, believing that something was wrong with Autumn, carried her upstairs while he yelled for Frye. At that point, Frye grabbed Autumn and accused him of killing her.

On November 3, 1998, Smith signed and verified the October 27 statement. In answer to followup questions, Smith denied putting trash in the dumpster the morning of the crime and said that the cotton materials found on the living room floor were baby wipes put there by Ashley.

State v. Smith, 780 N.E.2d 221, 225-227 (Ohio 2002).

At trial, coroner Dr. Marvin S. Platt, who conducted the autopsy, testified for the State.  He concluded that Autumn died from compression asphyxia and blunt trauma to the head.  Other injuries were consistent with Autumn lying on her abdomen with her face forced into a pillow.  Contusions on her buttocks, Dr. Platt testified, indicated that she was subject to pressure from the weight of another person.  He stated that hemorrhages in her brain were consistent with shaken baby syndrome, indicating an attempt to restrain her.  Consistent with evidence that someone had grasped the back of her head, Autumn was missing hair from that area.  Enlargement and hemorrhaging from her vagina and anus indicated attempted penetration.

In his defense, Smith contended that he did not act with the requisite intent to murder his victim. In support of his defense, Smith offered the testimony of Robert Forney, Jr., a board certified toxicologist, to develop his defense that he was severely intoxicated when he committed the assault.

-5-

Smith also called witnesses who testified that he was a heavy drinker susceptible to blackouts.  He called other witnesses who stated that, on previous occasions when he had watched their children, he was caring towards them.  Other relevant facts will be set forth when necessary during the Court's discussion of Smith's individual claims for relief.

## III.  FEDERAL HABEAS PROCEEDING

On April 14, 2004, Smith filed a notice of intent to file a petition for a writ of habeas corpus, a motion for appointment of counsel, and a motion to proceed in forma pauperis.  The Court granted the latter two motions and appointed Henry F. DeBaggis as lead counsel and attorneys from the Office of the Ohio Public Defender as co-counsel for Smith.

Smith filed a petition on May 26, 2004.  The Respondent filed a return of writ on July 30, 2004.  After requesting and receiving an extension to file a traverse, Smith filed the traverse on October 28, 2004.  Thereafter, the Respondent filed a sur-reply.

On December 29, 2004, Smith filed a motion for leave to conduct discovery, which the Court granted in part and denied in part.  Although the Court denied Smith's request to conduct discovery regarding a conflict of interest with counsel and to ascertain his serotonin levels, it permitted him to depose trial counsel to discern why counsel did not request a so-called "solitary juror" instruction, in which the trial court would charge the jury that a single juror could prevent the imposition of the death penalty.  After completing this discovery, Smith moved the Court to expand the record to include the depositions of trial counsel.  On October 18, 2005, the Court granted the motion as unopposed, rendering this matter ripe for disposition.

## IV. GROUNDS FOR RELIEF

In his petition, Smith asserts fourteen (14) grounds for relief:

1.  Steven Smith's right to due process and his right against cruel and unusual punishment were violated because he was denied a jury instruction on the lesser included offense of involuntary manslaughter to the charge of capital murder.

2.  Steven Smith's due process right to a fair trial was violated because he was denied a jury instruction on voluntary intoxication as a defense to the charge of capital murder.

3.  The trial court's jury instruction on Steven Smith's decision not to testify violated his due process right to a fair trial, and infringed on his Fifth Amendment right against self-incrimination.

4.  The admission of gruesome photographs and slides into evidence at both phases of Steven Smith's capital trial violated his due process right to a fair trial and his right to a reliable capital sentencing hearing.

5.  Steven Smith's due process right to a fair trial was violated by acts of prosecutorial misconduct at both phases of his capital trial.

6.  Steven Smith's right to a fair trial, a reliable capital sentencing determination, and due process were infringed by the State's use of inflammatory and repetitive evidence about the cause of the victim's death.

7.  Steven Smith's jury was instructed to be unanimous when deciding if the aggravating circumstance outweighed, beyond a reasonable doubt, his mitigating factors, in violation of the Ohio statute and Smith's right to due process and his right against cruel and unusual punishment.

8.  Steven Smith's due process right to a fair trial was violated when two State's witnesses testified, beyond their expertise, that Smith intended to kill the victim.

9.  The service of a juror at the penalty phase who was biased in favor of capital punishment violated Steven Smith's right to due process and his right to an impartial jury.

10. Steven Smith's right against cruel and unusual punishment and his right to due process were violated because the trial court's remark implied to the jury that Smith's mitigating evidence deserved no weight.

11. Steven Smith's right to due process and his right to a reliable capital sentencing hearing were violated because the sentencer considered victim impact evidence in the form of an opinion

-7-

about the proper punishment for Smith.

12.    Steven Smith's death sentence is unconstitutional because O.R.C. § 2929.03(D)(1) and O.R.C. § 2929.04 are vague, both facially and as applied to Smith.

13.    Steven Smith was prejudiced by his trial counsel's deficient performance.

14.    Steven Smith's right against cruel and unusual punishment will be violated if he is executed by lethal injection.


## V. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  See also Woodford v. Garceau, 538 U.S. 202, 210 (2003); Barker v. Yukins, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Smith's petition was filed on May 26, 2004, the AEDPA governs this Court's consideration of his petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  Woodford, 538 U.S. at 206 (citing Williams v. Taylor, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings."  Uttecht v. Brown, – U.S. – , 127 S.Ct. 2218, 2224 (2007)(citations omitted).  Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

-8-

--

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  Williams, 529 U.S. at 412; Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000).[2] The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately.  Williams, 529 U.S. at 412-13; Hill, 337 F.3d at 711.  A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  Williams, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court

---

[2]        Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  Hill v. Hofbauer, 337 F.3d 706, 716 (6th Cir. 2003).

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  Id. at 407; Hill, 337 F.3d at 711.  As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold."  Schriro v. Landrigan, – U.S. –, 127 S.Ct. 1933, 1939 (2007)(citing Williams, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  Id.

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d)(2) in Wiggins v. Smith, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented."  Id. at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003); Clark v. O'Dea, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary.").  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact.  See Mason, 325 F.3d at 737-38 (holding

-10-

ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding.  Clinkscale v. Carter, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  Id.; Newton v. Million, 349 F.3d 873, 878 (6th Cir. 2003); Maples v. Stegall, 340 F.3d 433, 436-37 (6th Cir. 2003).[3]  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a de novo review of the claim.  Maples, 340 F.3d at 436-37; Benge v. Johnson, 312 F. Supp.2d 978, 987 (S.D. Ohio 2004).[4] If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law."  Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005)(citing Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000)).

---

[3]      Prior to Maples, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts.  See e.g., Clifford v. Chandler, 333 F.3d 724, 730 (6th Cir. 2003); Doan v. Brigano, 237 F.3d 722, 727 (6th Cir. 2001). However, in Maples, the Sixth Circuit found that Doan and Clifford had been abrogated by the United States Supreme Court's decision in Wiggins.  Maples, 340 F.3d at 437.

[4]      To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted.  O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Maples, 340 F.3d at 437-38.

-11-

## VI.    PROCEDURAL DEFAULT

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." Fautenberry v. Mitchell, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing Coleman, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied. Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. O'Sullivan v. Boerckel, 526 U.S. at 848; Rust v. Zent, 17 F.3d at 160.

In Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state

-12-

> procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001)(*citing* Maupin, 785 F.2d at 138)(further citations omitted).

In determining whether the Maupin factors are met, the federal court looks to the last explained state court judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991);  Combs v. Coyle, 205 F.3d 269, 275 (6th Cir. 2000).  If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and consider the merits."  Ylst, 501 U.S. at 803.  "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review."  Id. at 801.

If the three Maupin factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal review.  Maupin, 785 F.2d at 138; Hutchison v. Bell, 303 F.3d 720, 735 (6th Cir. 2002); Combs, 205 F.3d at 274-275.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); Mohn v. Bock, 208 F. Supp.2d 796, 801 (E.D. Mich.

-13-

2002).  Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable.  Murray, 477 U.S. at 488; Mohn, 208 F. Supp.2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  Murray, 477 U.S. at 488-489; Rust v. Zent, 17 F.3d 155, 161 (6th Cir. 1994); Mohn, 208 F. Supp.2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  Murray v. Carrier, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995)(quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  Dretke v. Haley, 541 U.S. 386, 392 (2004)(citing Murray v. Carrier, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which

-14-

the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" Id. (*quoting* Sawyer v. Whitley, 505 U.S. 333, 336 (1992)).

While Smith generally asserts that ineffective assistance of counsel can be used to demonstrate the "cause" necessary to overcome any procedural default, he does not specifically apply this assertion in the procedural default section of his traverse.  Instead, Smith defends each assertion of procedural default when he addresses the individual grounds for relief.  The Court will likewise address claims of procedural default when it reviews Smith's individual claims.  It will also address Smith's assertion that ineffective assistance of counsel can serve as "cause" to excuse his procedurally defaulted claims on an individual basis.

## VII. INDIVIDUAL GROUNDS FOR RELIEF

### A. First, Second, Third, and Seventh Grounds for Relief - Jury Instruction Error

In these grounds for relief, Smith contends that the trial court erred when it charged or failed to charge the jury on several occasions.  He claims that the trial court should have instructed the jury, as defense counsel requested during trial, on intoxication and its effect on a defendant's formation of the specific intent necessary to be guilty of aggravated murder.  He also asserts that the trial court should have provided an involuntary manslaughter instruction to the jury.  Smith further argues that the trial court erred when it commented on Smith's failure to testify.  Finally, he claims that the trial court's penalty phase instruction on juror sentencing unanimity was constitutionally infirm.

For habeas corpus relief to be warranted on the basis of an incorrect jury instruction, a petitioner must show more than  "the instruction [was] undesirable, erroneous, or even universally condemned."

-15-

It must also show that, taken as a whole, the erroneous instruction was *so* infirm that it rendered the entire trial fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62, 72 (1991)(*citing* Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Hardaway v. Withrow, 305 F.3d 558, 565 (6th Cir. 2002); Buell v. Mitchell, 274 F.3d 337, 355 (6th Cir. 2001).

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal."  Henderson, 431 U.S. at 154.  A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Id. at 155.

### 1. First and Second Grounds for Relief

Smith contends that the trial court erred when it refused to charge the jury on voluntary intoxication and involuntary manslaughter.  He argues that, had the trial court provided the jury with these instructions, it would have given the jury a third option between convicting on aggravating murder and the death specifications attendant thereto, and outright acquittal.  Smith raised these arguments on direct appeal to the Ohio Supreme Court and has therefore preserved these claims for federal habeas review.

At the conclusion of the culpability phase of trial, defense counsel requested that the court charge the jury on intoxication and involuntary manslaughter.  After reciting several Ohio Supreme Court cases on the doctrine of intoxication, the trial court compared Smith's case to State v. Smitz, 690 N.E.2d 522, 528-29 (Ohio 1998), in which the Ohio Supreme Court found that, despite evidence that the defendant was intoxicated, the jury could not have reasonably found that intoxication prevented the

defendant from forming the intent to kill.

In addition to finding the Smitz opinion binding authority, the trial court reviewed the evidence

adduced during Smith's trial, holding that an intoxication instruction was not warranted:

> First of all we have testimony from the coroner in regard to intent, both from Dr. Platt and the emergency room doctor, Dr. [Ralph] Battels, first that the injury to Autumn Carter had to be caused from repeated and prolonged assaults to her head and torso, they could not have been caused by laying over the child accidentally in a sleep or a drunken stooper. Second, that the many bruises on her buttocks and the enlarged and inflamed vaginal opening and circumferential bruise around the anus were all consistent with a deliberate sexual assault and not consistent with a single impact or accidental injury. Secondly, we had a group of witnesses who testified that the Defendant was not incoherent or confused when they saw him at 3:30 in the morning, that he knew he was being accused of killing the child, that he understood what the victim's mother accused him of, became angry and threw an alarm clock, that he was able to gather up the evidence, specifically the diaper, or the shell, and beer cans and take them to the dumpster before the police arrived, that he told the neighbor and police both that he wasn't that sick kind of guy that would do a thing like this, that when the police officer first came he immediately denied that he did the crime in this case, but then clammed up when the officer tried to get him to give him more information. In other words, there was evidence on his part immediately after the corpse was discovered of planning efforts to persuade, and restraining against making unwise additional statements. We also have some testimony of various witnesses, some of whom say he appeared to be intoxicated, but we have some testimony from some of the witnesses that even when he was intoxicated he still was very much in control of himself. We have the evidence of Keysha Frye that he did not act irrationally when he drank. We have the evidence of Brett Samples that he actually shot pool better when he drank, and there may be some other evidence along that regard. And then finally and very importantly we have no evidence in this case that the Defendant was so intoxicated that he did not intend what he was doing when he assaulted, or if he did assault Autumn Carter, which is the presumption we have to make to give this instruction. Dr. Forney clearly said that blackouts which might have been possible in his case were memory losses. They were not acting under the influence of alcohol without knowing what they were doing. He specifically said the fact that someone had a memory loss did not indicate in any way they lacked the purpose to do the activities they did, which they could no longer remember. So for all those reasons I would have to say that there is insufficient evidence to give . . . an intoxication instruction . . . .

(Doc. No. 32, at 2071-74).

On direct appeal, the Ohio Supreme Court adopted the trial court's reasoning, finding that the trial court did not err when denying the defense's request to charge the jury on voluntary intoxication. State v. Smith, 780 N.E.2d 221, 228 (Ohio 2002).

Upon reviewing both the trial court and Ohio Supreme Court opinions, the Court finds that they did not run afoul of any United States Supreme Court precedent. As stated above, jury instructions are generally matters of state law, not cognizable on federal habeas review. Based on Ohio law on voluntary intoxication and the evidence presented during Smith's trial, the Court cannot find, as it must for Smith to prevail on this claim, that the trial court's decision not to instruct the jury on voluntary intoxication rendered his entire trial fundamentally unfair.

Moreover, the Court distinguishes this claim from a recent Sixth Circuit opinion in which that Court held that an improper intoxication instruction was subject to a harmless error analysis. In Wilson v. Mitchell, No. 03-3362, 2007 WL 2316644 (6th Cir. Aug. 15, 2007), the Court found, along with the Ohio Supreme Court, that the trial court's intoxication instruction improperly shifted the burden of proof to the defendant in violation of In re Winship, 397 U.S. 358, 364 (1970). Id. at *8. The Court concluded that, pursuant to the harmless error standard set forth in Frye v. Pliler, – U.S. – , 127 S.Ct. 2321 (2007), the infirm instruction did not have a "substantial and injurious effect on the verdict." Id. at *17 (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

The obvious distinction between Smith's trial and Wilson's trial is that, in Smith's case, the trial court refused to provide *any* intoxication instruction. The United States Supreme Court has held that a criminal defendant is not constitutionally entitled to a voluntary intoxication defense. Montana v. Egelhoff, 518 U.S. 37, 56 (1996). Moreover, the Sixth Circuit has held, based on Egelhoff and the

-18-

strictures of the AEDPA, that a petitioner is not entitled to habeas relief because of a trial court's failure to provide an intoxication instruction because there is no Supreme Court precedent "holding that the Constitution requires trial courts to give jury instructions on intoxication as a defense to a murder charge . . . ".  Hill v. Mitchell, 400 F.3d 308, 322 (6th Cir. 2005).

In reviewing the petitioner's claim in that case, the Hill Court observed that, while Winship and Martin v. Ohio, 480 U.S. 228 (1987), establish that a burden-shifting jury instruction may violate the Due Process Clause of the Fourteenth Amendment, no such violation occurs when the instruction does not alleviate the State's burden to prove all elements of the crime beyond a reasonable doubt, such as in instances where a criminal defendant must prove an affirmative defense by a preponderance of the evidence.  Hill, 400 F.3d at 323.  The Hill Court concluded that, to the extent the petitioner was actually asserting that the *absence* of an intoxication instruction was tantamount to the State failing to meet its burden of establishing the petitioner's *mens rea* for the crime beyond a reasonable doubt, this claim lacked merit because the Ohio Supreme Court found that the State had met its burden by proving the specific intent element.  Id.

Similarly here, the Ohio Supreme Court found  that there was more than adequate evidence of Smith's intent to kill.  The Ohio Supreme Court carefully examined the State's medical testimony and found that the nature and duration of Autumn's injuries were sufficient to  demonstrate Smith's intent to kill her.  Like the Hill petitioner, Smith cannot claim that the State did not meet its burden under Winship.  Accordingly, this claim is not well-taken.

Smith also cannot reasonably argue that the trial court erred when it failed to instruct the jury on involuntary manslaughter.  The trial court addressed this issue at the same time it provided its decision on Smith's intoxication instruction request.  When it initially stated that an involuntary

manslaughter charge was not justified, defense counsel proffered that the charge would be warranted if Smith intended to molest, but not to kill.  The trial court responded, "[I]f [Smith] had gone to the stand and said something like that clearly you would get it.  If he said that I intended to rape the child, I didn't intend to kill the child, it was an accident.  I didn't know what was happening until it was too late, you would get a charge like that, but there is no evidence like that."  (Doc. No. 32, at 2078).

On direct appeal, the Ohio Supreme Court once again adopted the trial court's findings.  It held:

> Contrary to Smith's contention, he presented no evidence at trial indicating that he intended to sexually assault, rather than kill, Autumn. Instead, the evidence reveals that Smith purposely killed Autumn while raping or attempting to rape her. Medical testimony found that the weight and pressure of Smith's body on top of the sixteen-pound baby was one of the direct causes of her death. The violence of the attack, which was estimated by the coroner to have lasted between ten and thirty minutes, resulted in hemorrhages to her brain and retina and caused her to sustain brain contusions and other contusions on her body. Witnesses testified that these injuries showed intent to kill. Consequently, we reject Smith's argument that evidence of purpose was lacking. Accordingly, we find that the court did not err in denying Smith's request for an involuntary manslaughter instruction. See State v. Raglin (1998), 83 Ohio St.3d 253, 257-258, 699 N.E.2d 482; State v. Smith (2000), 89 Ohio St.3d 323, 331, 731 N.E.2d 645.

State v. Smith, 780 N.E.2d at 228.

Under Ohio law, an instruction on a lesser included offense is only required where "the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."  State v. Thomas, 533 N.E.2d 286, ¶ 2 of the syllabus (Ohio 1988).  The trial court's decision not to charge the jury on involuntary manslaughter comports with Ohio law.  More importantly, the Ohio Supreme Court's decision is not contrary to any United States Supreme Court precedent.  Accordingly, this claim lacks merit.

### 2. Third Ground for Relief

Smith next argues that the trial court violated his Fifth Amendment right not to testify when it

-20-

commented on his failure to do so while charging the jury at the end of the culpability phase of trial. The Respondent contends that this claim is procedurally defaulted because counsel did not contemporaneously object to the instruction and, on direct appeal, the Ohio Supreme Court reviewed it for plain error.

Ohio courts have determined that a failure to contemporaneously object to an alleged error constitutes procedural default. State v. Williams, 364 N.E.2d 1364 (Ohio 1977).  If a defendant fails to object to a trial error that would affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim.  State v. Slagle, 605 N.E.2d 916, 925 (Ohio 1992).[5]  Smith argues that the Ohio Supreme Court did not actually review this claim for plain error because it did not specifically so state in its opinion.  This assertion is not supported by the record.  In the paragraph immediately preceding the Ohio Supreme Court's analysis of this claim, it stated, "As for the remaining arguments regarding jury instructions, since Smith did not raise an objection, we apply a plain error analysis." Smith, 780 N.E.2d at 229.  Thus, the plain error application could hardly be more clear.

In Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000), the Sixth Circuit held that "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Thus, the Ohio Supreme Court's alternative holding on the merits while reviewing a claim for plain error does not excuse Smith's failure to contemporaneously object to the jury instruction during trial.  Accordingly, the Court finds these claims to be procedurally defaulted.

Smith asserts he can surmount the procedural default hurdle by asserting ineffective assistance

---

[5]Additionally, Ohio Rule of Criminal Procedure 52(B) states:

**(B) Plain error**
Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

of counsel.  To do so he must demonstrate "that [he] received ineffective assistance of counsel that rose to the level of a violation of [his] Sixth Amendment rights."  Id. at 550.  Specifically, a habeas petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).  A petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  Second, the petitioner must show that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.  If a petitioner cannot fulfill the requirements of prong one of the Strickland test, a court need not undergo an analysis of the second prong and can conclude that a habeas petitioner was provided with effective assistance of counsel in accordance with the Sixth Amendment.  See Lundgren v. Mitchell, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.")(quoting Strickland, 466 U.S. at 697).

Smith cannot excuse the default of his third jury instruction claim by asserting ineffective assistance of counsel.  Because the Court finds below that this claim lacks merit, it consequently must determine that Smith cannot establish the prejudice necessary to demonstrate ineffective assistance of counsel.  Thus, it is procedurally defaulted.

Smith asserts that the trial court erred when it charged the jury regarding his failure to testify. The trial court instructed the jury as follows:

> In this case Steve Smith did not testify.  Every person accused of a crime has an absolute constitutional right to remain silent, and his decision to do so must not be considered by you in any way.  The fact that a Defendant chose not to testify does not create any inference against him and you may not imply anything from his failure to do so.  A Defendant is not called on to advance a theory that may explain something even if it will

> otherwise remain a mystery.  A juror must not be influenced by the Defendant's failure
> to testify.

(Doc. No. 33, at 2174).  Smith complains that, while portions of the instruction are appropriate, the trial court erred when it commented on Smith's failure to "explain a mystery."  He contends that, by using this language, the trial court implied that Smith could have, or should have, explained the mystery behind how the murder occurred.

In *Griffin v. California*, 380 U.S. 609 (1965), the United States Supreme Court held that it is unconstitutional for a prosecutor *or* trial judge to comment on a criminal defendant's failure to testify. In *Griffin*, the prosecution had encouraged the jury to draw adverse inferences from the defendant's failure to testify.  *Id.* at 610.  The Court found that the prosecution's comments violated the defendant's Fifth Amendment right against self-incrimination.  The Supreme Court clarified the *Griffin* holding in *Lakeside v. Oregon*, 435 U.S. 333 (1978).  The *Lakeside* Court explained, that, while the *Griffin* Court found that adverse comments on a defendant's failure to testify are constitutionally infirm,

> a judge's instruction that the jury must draw *no* adverse inferences of any kind from the defendant's exercise of his privilege not to testify is "comment" of an entirely different order. Such an instruction cannot provide the pressure on a defendant found impermissible in *Griffin*. On the contrary, its very purpose is to remove from the jury's deliberations any influence of unspoken adverse inferences.

*Id.* at 339.

Although the Ohio Supreme Court opinion does not cite to *Lakeside*, its findings are not contrary to it.  It held: "The instruction taken as a whole emphasized appellant's right to remain silent.  . . .  Although the language Smith complains of was unnecessary, it does not, when viewed in the context of the overall charge, violate his Fifth Amendment rights."  *State v. Smith*, 780 N.E.2d at 229.  The Ohio Supreme Court's decision is not contrary to the *Griffin* or *Lakeside* holdings because the trial

court did not expressly or implicitly inform the jury that it should draw an adverse inference from Smith's failure to testify.  Indeed, it cautioned the jury not to do so.  Thus, this claim lacks merit.

### 3. Seventh Ground for Relief

In this ground, Smith asserts that the trial court provided the jury with a so-called "acquittal-first" instruction.  This type of instruction, pursuant to a recent Sixth Circuit opinion, "requires the jury to unanimously reject a death sentence before considering other sentencing alternatives."  Spisak v. Mitchell, 465 F.3d 684, 709 (6th Cir. 2006) petition for cert. filed, 75 U.S.L.W. 3638 (U.S. May 16, 2007)(No. 06-15).  Smith claims that the Ohio Supreme Court's decision on this issue runs afoul of the United States Supreme Court's holding in Mills v. Maryland, 486 U.S. 367 (1988), which held that it is improper to lead a jury to believe that it must unanimously find the presence of mitigating factors before it may decline to recommend death.

The Respondent asserts that this claim is procedurally defaulted because defense counsel did not object to it during trial.  Smith counters that the Ohio Supreme Court addressed the claim on the merits, forgiving any default thereby.  In fact, the Ohio Supreme Court did not preface its review of the claim on the merits with language that it would review the claim pursuant to a plain error standard.  In his appellate brief to the Ohio Supreme Court, however, Smith conceded that he neither contemporaneously objected to the instruction nor proposed his own unanimity instruction.[6]  As the Respondent observes, it is unlikely the Ohio Supreme Court addressed the merits of a claim that the appellant acknowledged was subject to a plain error review based on his failure to contemporaneously object during trial.  Thus, the Court finds that, while debatable, this claim is procedurally defaulted.

---

[6]     In the "standard of review" section of his brief Smith wrote, "Smith failed to object to the penalty phase instructions and he did not propose proper penalty phase instructions. Accordingly, this Court reviews this issue for plain error."  (Doc. No. 18, at 152)(citations omitted).

Even if it were ripe for habeas review, this claim would not be well-taken.  Contrary to Smith's assertion, the instruction the trial court provided to his jury is materially different from the one found to be unconstitutional in <u>Mills</u> and its Sixth Circuit progeny.  Specifically, in accordance with the <u>Mills</u> holding, the trial court instructed the jury that, "[i]t is not necessary that you unanimously agree on the existence of a mitigating factor before that factor can be weighed by you against the aggravating circumstances."  (Doc. No. 35, at 2557).  It then charged the jury on the circumstances under which it may impose a death sentence:

> You shall impose the death sentence only if all 12 of you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  You shall impose one of the life imprisonment verdicts if all 12 of you do not unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

<u>Id.</u>

On direct appeal, the Ohio Supreme Court found that, while it was preferable to provide the jury with the type of  instruction dictated in <u>State v. Brooks</u>, 661 N.E.2d 1030 (Ohio 1996), the instruction the trial court provided was not improper:[7]

> In proposition of law five, Smith challenges the trial court's instruction regarding life imprisonment on the ground that it failed to comply with <u>State v. Brooks</u> (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030. In <u>Brooks</u>, we found that the court erred in instructing jurors that they must unanimously determine that the death penalty is inappropriate before they consider a life sentence. The instruction at hand differs from that of <u>Brooks</u> in that the trial court here never advised the jury that it had to unanimously reject the death penalty before considering a life sentence. Instead, the jury was told that it must impose a life sentence if not all twelve jurors agreed to recommend death. The jurors were implicitly told that a single juror could prevent the death penalty. The instructions were consistent with R.C. 2929.03(D)(2). <u>See State v. Stallings</u> (2000), 89 Ohio St.3d 280, 293, 731 N.E.2d 159. Although it is advisable for courts to explicitly instruct the jury that a single juror may prevent a death penalty recommendation by finding that the aggravating circumstances * * * do not outweigh the mitigating factors

---

[7]  In <u>Brooks</u>, the Ohio Supreme Court held that a trial court should instruct a capital jury that a solitary juror can prevent the death sentence.  <u>Id.</u> at 1042.

(State v. Madrigal [2000], 87 Ohio St.3d 378, 393, 721 N.E.2d 52), the charge as given did not create prejudicial error. We overrule proposition of law five.

State v. Smith, 780 N.E.2d 221, 229 (Ohio 2002).

Smith cannot demonstrate, as he must to succeed on this claim, that the Ohio Supreme Court's reasoning was contrary to any United States Supreme Court precedent. As noted above, the trial court expressly fulfilled the Mills mandate by stating that the jurors need not be unanimous to find the existence of a mitigating factor. Moreover, unlike the trial court in Spisak, the jurors here were told that they could find for death only if all twelve of them unanimously found that the State proved that the aggravating circumstances outweighed the mitigating factors. Thus, as the Ohio Supreme Court opined, the jurors were implicitly told that, if one of them did not find that the death sentence was appropriate, the jury would be required to impose a life sentence.

Finally and importantly, the jury instruction in this case is almost identical to a jury instruction that was the subject of a recent Sixth Circuit decision. In Hartman v. Bagley, – F.3d – , 2007 WL 1976005 (6th Cir. July 10, 2007), the Sixth Circuit held that a jury instruction nearly identical to the one provided to Smith's jury passed constitutional muster. In that case, the trial court instructed the jurors what they were to do if all twelve agreed that the aggravating factors outweighed the mitigating circumstances. It then explained,

> "'On the other hand, if after considering all of the evidence . . . *you cannot unanimously agree* that the State . . . proved beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors, then you'll return your recommendation reflecting your decision. *In this event, you will then proceed to determine which of the three possible life sentences to impose.'"*

Id. at *15 (emphasis in original).

The Sixth Circuit found this instruction adequately informed jurors about what to do in the event

-26-

that they did not find that the aggravating circumstances outweighed the mitigating factors.  Since the instruction did not tell jurors that they had to unanimously find that the aggravating circumstances failed to outweigh the mitigating factors, the <u>Hartman</u> Court distinguished it from cases, such as <u>Spisak</u>, in which jurors may have been led to believe that they must first unanimously "acquit" the defendant of the death penalty before choosing a life sentence.

Because of the similarities between the <u>Hartman</u> instruction and the instruction provided to Smith's jury, Smith's claim ultimately cannot prevail.  While this Court agrees with the Ohio Supreme Court that it would have been preferable for the trial court to explicitly state that a solitary juror could prevent a death sentence, the Court cannot find that the Ohio Supreme Court's conclusion that Smith suffered no prejudicial error was contrary to any United States Supreme Court precedent.  Accordingly, this claim is not well-taken.

### B. Fourth, Eighth, Tenth, and Eleventh Grounds for Relief - Trial Court Error

Smith alleges in these grounds for relief that the trial court erred in admitting some testimony and in remarking on certain evidence during trial.  He contends that the trial court erred when it permitted the State's medical experts to testify regarding whether Autumn was intentionally or accidentally killed, when it remarked on the mitigating evidence, and when it permitted the introduction of victim impact evidence.

The Court reviews each of these claims while observing that the United States Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  <u>Estelle</u>, 502 U.S. at 68 (citations

omitted); 28 U.S.C. § 2254(a).  In addressing state evidentiary issues, a federal court's role is limited; its sole obligation is to determine whether admitting the evidence at issue violated the petitioner's right to due process and a fair trial.  Id.  A trial may be deemed fundamentally unfair if it can be shown by a reasonable probability that the outcome would have been different without the evidence, or if there is a basis upon which to conclude that the result was unreliable because of such evidence.  Lockhart v. Fretwell, 506 U.S. 364, 370 (1993).  The Estelle Court noted that the category of infractions that violate fundamental fairness is a narrow one.  Id.  (citing Dowling v. United States, 493 U.S. 342, 352 (1990).

### 1. Fourth Ground for Relief

Smith argues that the trial court admitted several gruesome photographs taken of Autumn in the emergency room and during her autopsy.  He claims that the probative value of these photographs, if any, were far outweighed by the prejudicial effect they caused.  Smith maintains that, other than demonstrating his purpose or intent, the photographs did not inform the jury about any issue that was in dispute during trial and that the nature of Autumn's injuries were easy for a juror to understand without the use of the photographs.  This claim is preserved for federal habeas review.[8]

On direct appeal, the Ohio Supreme Court addressed this issue pursuant to Ohio law. It found that the trial court did not abuse its discretion in admitting the slides and photographs.  Its reasoning is set forth below:

---

[8]        Although the Respondent asserts that this claim is procedurally defaulted because Smith failed to contemporaneously object and that Smith conceded as much in his brief on direct appeal, neither assertion is supported by the record.  First, as Smith quotes in his traverse (and his appellate brief), defense counsel objected to the use of the photographs during trial.  Moreover, Smith asserted in his appellate brief that the claim was "preserved by several objections."  (Doc. No. 18, at 105).  Finally, the Ohio Supreme Court concurred with Smith's preservation assertion, addressing the merits of the claim after observing that the photographs were admitted "over defense objection."  State v. Smith, 780 N.E.2d 221, 231 (Ohio 2002).

The admission of photographs is left to the sound discretion of the trial court. Evid.R. 403, 611(A). We have previously held that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." State v. Maurer (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the *374 syllabus; See, also, State v. Morales (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267; State v. Twyford (2002), 94 Ohio St.3d 340, 357-358, 763 N.E.2d 122.

The photographs in question reveal marks and abrasions on the victim's face, torso, and buttocks as well as injuries to her lips, ears, scalp, chin, vagina, and rectum. The autopsy slides depict injuries to the victim's internal organs. Although the trial judge was at first reluctant to admit the autopsy slides, he was persuaded that their admission was appropriate because they could be used to assist the coroner in his testimony.

Upon review, we find no reversible error in the admission of the photographs and slides at either phase of trial. To begin with, although many photographs and slides were admitted, we note that number alone does not require reversal. As we have previously stated, "the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." State v. DePew (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542.

Although arguably gruesome, these photographs and slides were relevant in that they depicted the wounds inflicted on the victim, supported the coroner's testimony on cause of death, and helped prove appellant's intent. With respect to the autopsy slides, the trial court reduced the possibility of undue prejudice by refusing to allow the slides to be taken into the deliberation room.

Moreover, even if some of the photographs or slides were improperly admitted, we note that any prejudice was harmless considering the overwhelming evidence of Smith's guilt. In addition, any prejudicial impact is minimized by our independent review. See State v. Davie (1997), 80 Ohio St.3d 311, 318, 686 N.E.2d 245.

State v. Smith, 780 N.E.2d at 230-31.

The Ohio Supreme Court's grounds for finding no undue prejudice from admission of the photographs and slides is sound. Smith was not denied due process by the admission of the photographs

and slides because, even if disturbing, they were probative of the testimony provided by the State's

medical experts to prove Smith's intent and that probative value was not outweighed by any potential

that the jury might be outraged by them.  There is no basis on which to conclude that the admission of

this evidence rendered the result of Smith's trial unreliable.  Smith's fourth ground for relief is without

merit.

### 2. Eighth Ground for Relief

Smith maintains that the trial court erred when it permitted the State's two medical experts, Dr.

Battels, who examined Autumn in the emergency room, and Dr. Platt, the coroner who performed the

autopsy, to testify regarding the cause of Autumn's death.  He claims that such testimony invaded the

province of the jury in reaching the decision regarding his purpose to kill.  Smith maintains that there

was an abundance of evidence supporting his assertion that he was intoxicated and did not intend to kill

Autumn, but that such evidence was invalidated by the doctors' testimony.  Smith raised this claim on

direct appeal to the Ohio Supreme Court and it is therefore ripe for habeas review.

As with ground for relief four, above, the Ohio Supreme Court addressed this claim pursuant

to state law:

> In proposition of law six, Smith contends that Dr. Platt, the coroner, and Dr. Battels, the
> emergency room physician, offered opinions outside their area of expertise. In particular,
> he objects to the fact that the two physicians were asked to give their opinions about the
> grid-like patterns on Autumn's face and whether a cushion taken from Frye's sofa could
> have caused the abrasions. Smith also objects to the physicians' testimony regarding
> Smith's intent and to the coroner's testimony that Autumn was crying during the attack.
> We find no merit in Smith's assertions.
>
> The doctors' comments on weave-pattern comparisons were not elicited as expert
> testimony but were instead made in their capacity as lay witnesses. Their testimony was
> therefore admissible under Evid.R. 701, since it was based upon their visual comparison
> of the cushion and the marks on Autumn's face. See, e.g., State v. Jells (1990), 53 Ohio
> St.3d 22, 28-29, 559 N.E.2d 464 (police officer's testimony on footprint comparisons

admissible as lay opinion). Furthermore, the doctors' testimony that the victim was resisting and crying and that she was intentionally killed was admissible under Evid.R. 702 and 704. Such testimony was relevant to describing the circumstances of the victim's death and was proper expert testimony on the nature of the death-i.e., that it was not accidental. Proposition of law six is overruled.

State v. Smith, 780 N.E.2d at 231.

As with ground for relief four, the Court finds that the State's medical experts' testimony did not deny Smith the due process to which he was entitled under the Constitution. The Ohio Supreme Court found the testimony regarding the marks on Autumn's face was lay testimony and therefore admissible. Moreover, its decision to find Autumn's resistance and crying admissible does not appear prejudicial as it permitted the State to demonstrate that her death was not accidental, countering Smith's allegations that his intoxication negated his intent. Again, the admission of this testimony does not render the result of the trial unreliable. Thus, Smith's eighth ground for relief is not well-taken.

### 3. Tenth Ground for Relief

Smith contends that the trial court somehow undermined the mitigating evidence he presented through the testimony of Richland County Corrections Officer, Karen Johnson. During direct examination, Johnson stated that Smith had only two minor disciplinary issues while incarcerated after the offense. At the conclusion of her testimony, the trial judge questioned the prosecution, "Do you folks really want to ask any questions?" (Doc. No. 34, at 2478). Smith extrapolates from this question that the trial court was undercutting the mitigatory significance of her testimony. On direct appeal, the Ohio Supreme Court summarily rejected this claim. Smith, 780 N.E.2d at 227. This Court likewise rejects the claim as not prejudicial to Smith's trial. As the Respondent suggests, there are many ways of interpreting the trial judge's question, including that Johnson's testimony was obviously truthful and not subject to debate on cross-examination. This claim lacks merit.

-31-

### 4. Eleventh Ground for Relief

Smith contends that the trial court improperly considered victim impact evidence when deciding his sentence.  He asserts that a statement Keysha Frye made during the sentencing hearing influenced the trial court's decision to sentence him to death.   The Respondent asserts that this claim is procedurally defaulted because Smith failed to object to Frye's statement during the sentencing hearing.  On direct appeal, the Ohio Supreme Court reviewed it for plain error.  Thus, the claim is defaulted.  Smith argues that he can overcome any procedural default because ineffective assistance of counsel should excuse it.  As is demonstrated below, however, Smith's claim lacks merit and he therefore cannot demonstrate the prejudice required to sustain a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984).

Keysha Frye made the following statement during the trial court's sentencing hearing:

I want Steve to know I have controlled my anger throughout this whole trial and now I finally get to say what I want to you.  I don't think I can do that without trying to get to you, but I have to stop and realize I have Ashley to look after.  I can't afford to sit and jog over someone as sick as you.  I will never understand what made you rape and murder my baby.  She only got to live six months of her life.  I will never get to see her first steps or hear her first words because of you.  She will be turning a year old Monday, but you took her away.  You deserve everything you get and more.  You are the sickest man I know, and I hate you.  I hope they torture and kill you exactly the same way you killed my baby, but worse.  I know somebody in prison will get ahold of you and kill you, but if they don't I want you to know when you are executed I will make sure that I am there to watch.  I hope to see your obituary in the paper soon.  I'm not only speaking for myself, I am also speaking for my family.  I hate you, Steve.  I hope you go to Hell.

(Doc. No. 37, at 2599).

The Constitution provides no bar to victim impact statements during the sentencing phase of a trial.  The United States Supreme Court has held that, "if the state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no

per se bar." <u>Payne v. Tennessee</u>, 501 U.S. 808, 826 (1991).  The <u>Payne</u> Court further opined that, "[t]here is nothing unfair about allowing the jury to bear in mind [the victim's family's] harm at the same time as it considers the mitigating evidence introduced by the defendant."  <u>Id.</u>

When reviewing this claim for plain error on direct appeal, the Ohio Supreme Court held that, while a trial court can hear victim-impact evidence regarding the effect the victim's death had on family members, it is not appropriate for the sentencing court to consider testimony regarding what sentence a defendant should receive based on such testimony.  <u>State v. Smith</u>, 780 N.E.2d at 235.  Thus, it concluded that Frye's opinion asserting that Smith should get the death penalty was improper.  Nevertheless, the court found no plain error from Frye's statement because the trial court's sentencing opinion did not demonstrate that it utilized this testimony when deciding how to sentence Smith.  <u>Id.</u> This reasoning does not run afoul of the <u>Payne</u> holding.  Under <u>Payne</u>, the trial court could consider much of Keysha's statement in sentencing Smith.  The Ohio Supreme Court found that the trial court did not consider the improper portion of the victim-impact testimony.  Smith does not refute this finding.  Thus, this claim lacks merit.

### C. Fifth and Sixth Grounds for Relief - Prosecutorial Misconduct

In these grounds for relief, Smith contends that the cumulative effect of multiple instances of prosecutorial misconduct denied him a fair trial.  He maintains that the prosecution erred when it: (1) used victim-impact evidence in its opening statement; (2) called Smith a "baby molester" and a "baby murderer"; (3) asked leading questions to its own non-hostile witnesses and vouched for Keysha Frye's testimony; (4) impeached defense witness Kathy Frost during its cross-examination of Theresa Sauders and Karen Samples; (5) used an infant CPR doll during Dr. Battels's testimony which came apart during a "shaken baby" demonstration; (6) used prejudicial remarks in its closing statement; (7) commented

on Smith's failure to testify; (8) argued that Smith committed the rape and murder with prior calculation and design when such argument was irrelevant; (8) prejudiced Smith by asserting that Smith hid behind defense counsel; (9) shifted the burden of persuasion during the penalty phase of trial; (10) argued non-statutory aggravating factors to the jury; (11) compared Smith's life with that of others who did not commit any crimes; and, (12) told the jury that death was the "right decision."

The Respondent asserts that all but sub-claim (5) are procedurally defaulted because Smith failed to object to the prosecutors' actions during trial.  On direct appeal, the Ohio Supreme Court reviewed these claims for plain error.  The Court finds that the remaining sub-claims are procedurally defaulted.  Although Smith argues that he can overcome any default, asserting that counsel's failure to object to the prosecutions' actions constitutes ineffective assistance of counsel, he cannot succeed on this argument because, as noted below, he cannot demonstrate that counsel's failure to object prejudiced the outcome of his trial.

To assert a successful prosecutorial misconduct claim in a habeas proceeding it "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)); Durr v. Mitchell, 487 F.3d 423, 439 (6th Cir. 2007).  This question must be answered in light of the totality of the circumstances in the case.  Lundy v. Campbell, 888 F.2d 467, 473 (6th Cir. 1989), cert. denied, 495 U.S. 950 (1990).  The prosecutor's comments must be so egregious as to render the trial fundamentally unfair.  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

The Sixth Circuit held in Boyle v. Million, 201 F.3d 711 (6th Cir. 2000), that a district court

-34-

should first determine whether the challenged statements were, in fact, improper, and if so, to then determine whether the comments were "flagrant," thus requiring reversal.  Id. at 717.  Flagrancy is determined by an examination of four factors: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of evidence against the accused.  Mason v. Mitchell, 320 F.3d 604, 635 (6th Cir. 2003)(citing Hill v. Brigano, 199 F.3d 833, 847 (6th Cir. 1999)).

The Ohio Supreme Court found no merit to any of Smith's prosecutorial misconduct claims. It analyzed each claim, as set forth below:

> First, Smith argues that the prosecutor made improper comments in his opening statement concerning the victim's physical appearance at birth (her height, weight, and hair and eye color) as well as information concerning Frye's life history. According to Smith, these comments constitute inappropriate victim-impact evidence. However, since the testimony merely elicited background information and was "not overly emotional or directed to the penalty to be imposed" State v. Reynolds [1998], 687 N.E.2d 1358), the remarks do not constitute plain error. See, also, State v. Goodwin (1999), 703 N.E.2d 1251.

> Second, Smith claims error in the prosecutor's reference to him in opening statement as a "baby murderer" and a "baby molester."  We have upheld similar remarks as "fair comment."  See, e.g., Nields, 752 N.E.2d 859, where the prosecutor referred to the defendant as a "mean-spirited derelict." Thus, since the evidence supports such characterization, we find no reversible error stemming from such remarks.

> Third, Smith argues that the prosecution asked leading questions of numerous witnesses and vouched for Frye's testimony by telling her she was doing a good job. Although there were in fact some leading questions, none of these questions resulted in prejudice to Smith. With respect to the prosecutor's comment to Frye, when read in context, it is clear that the prosecutor was simply reassuring Frye in the midst of her difficult testimony. Neither of these circumstances constitutes prosecutorial misconduct.

> Smith next argues that the prosecutor improperly impeached the credibility of defense witness Kathy Foster during another defense witness's testimony. The prosecutor was merely pointing out inconsistencies in her testimony, which was proper cross-

examination under Evid.R. 611(B). Smith also contends that it was wrong for the prosecutor to cross-examine defense witness Theresa Sauders about irrelevant issues such as whether Smith paid child support or visited his daughter and to cross-examine his sister, Karen Samples, about why she allowed Smith to watch her child, knowing that he consumed large amounts of alcohol. Defense counsel introduced these topics when Sauders testified on direct examination that Smith was a good father who took care of his daughter and when the witnesses testified that Smith babysat their children.

Smith next argues that prosecutorial misconduct occurred when the head and leg of a CPR doll came off as the coroner demonstrated the way in which the young victim was injured. No objection was made at the time of the incident, but defense counsel later moved for a mistrial, which the court denied. The record reflects that the incident was accidental and that the prosecutor in no way tried to inflame the passions of the jury. Cf. State v. Keenan (1993), 613 N.E.2d 203 (stabbing knife into counsel's table). As the trial court noted, "the jury could clearly see the witness was embarrassed when the things fell off the baby, the mechanical dummy, and it is true that several of them were laughing audibly, so again, I don't think it inflamed them in any way. So it is sort of a klutz-type move."

Smith also claims several instances of misconduct in the prosecutor's closing argument. We have reviewed each alleged instance and find that even where the comments were improper, they do not result in plain error. For instance, Smith claims misconduct when the prosecutor stated that the victim is "actually speaking to you through the evidence in the case. * * * Autumn Carter, she's crying out to you."  These comments, although emotional, were used to tie together the forensic evidence presented during trial that pertained to the victim, such as the clumps of her hair found on the coffee table, bloodstains discovered on the sofa, and diaper fabric found on the floor. Moreover, these comments fall within the wide latitude allowed by a prosecutor in closing argument. See State v. Bies (1996), 658 N.E.2d 754.

Furthermore, although the prosecutor's comment that Smith "gets joy or gets happiness out of molesting, raping a six-month old baby" is harsh, it was a comment addressing the sexual-motivation specification. Even if this comment is deemed improper, it does not represent plain error.

* * *

Smith objects to the prosecutor's question, which asked, "Did he claim accident, that he didn't do this on purpose?" Smith believes the prosecutor was commenting on his failure to testify. Smith takes these remarks out of context. The prosecutor was merely pointing out the defendant to the jury as a means of emphasizing that it was he who committed these heinous crimes. Moreover, the prosecutor was not commenting on Smith's failure to testify but was instead showing how the evidence supports the fact that he purposely

-36-

committed the crimes in question.

Smith next asserts that the prosecutor impermissibly argued "prior calculation and design" because they were not elements of the offenses charged. However, the jury was not misled by these remarks, since the prosecutor informed them that "prior calculation and design" were not issues in the case. Smith also objects to the prosecutor's suggestion that he was motivated by revenge when he committed the crimes in question. Although a prosecutor is "entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence" (State v. Smith [1997], 684 N.E.2d 668), the prosecutor's revenge theory is a stretch, particularly given the fact that Frye herself testified that Smith was not upset when he did not ejaculate during sex. Nevertheless, even if these remarks were improper, they did not affect the fairness of the trial and are not plain error.

Smith also claims prosecutorial misconduct occurred when the prosecutor told the jury there would be no instruction on intoxication. However, we find it was permissible for the prosecutor to point out to the jury that the evidence did not warrant such an instruction.

Smith also claims several instances of prosecutorial misconduct during the penalty phase. Upon review of the record, we find that no prosecutorial misconduct occurred that would have affected the fairness of the trial.

First, Smith contends that the prosecutor's opening statement improperly shifted the burden of proof by stating "that there can be no mitigating facts which outweigh the aggravating circumstances." Second, Smith argues that the prosecutor treated the nature and circumstances of the offense as an aggravating circumstance. While these statements were improper, the court's instructions as to the proper weighing process and its charge as to the precise aggravating circumstances cure any error. See State v. Stojetz (1999), 705 N.E.2d 329; State v. Hill (1996), 202, 661 N.E.2d 1068. Third, Smith contends that the prosecutor committed misconduct by comparing him to others who have below-average intelligence and are alcoholics but who do not commit crimes of this magnitude. Such comment is fair rebuttal to defense claims that the jury should consider Smith's intellectual impairment and alcoholism as significant mitigating factors. See State v. LaMar, 2002 767 N.E.2d 166, at 178. Finally, Smith argues that the prosecutor offered his personal opinion by stating that the imposition of the death penalty is "the right decision" to make. While this does convey the prosecutor's personal opinion, the remark was an isolated comment that does not reach the level of plain error. Donnelly v. DeChristoforo (1974), 416 U.S. 637, 646-647.

State v. Smith, 780 N.E.2d at 232-34 (parallel citations omitted).

While the Court agrees with several of the Ohio Supreme Court's findings, it cannot agree that

in two of Smith's sub-claims, sub-claim (7)(comment on Smith's failure to testify) and sub-claim (12)(comment that death was the right decision), the prosecutor's comments can be as easily excused as the state court found. Thus, although the Court acknowledges that both claims are procedurally defaulted, the Court will review these claims pursuant to the <u>Boyle</u> flagrancy test articulated above. After doing so, however, the Court ultimately concludes that, even if not defaulted, Smith would not be entitled to relief on these claims because the evidence against him was so overwhelming as to overcome the effect of any prosecutorial impropriety.

**Sub-claim (7) - comment on failure to testify.**

The Supreme Court announced in <u>Griffin v. California</u>, 380 U.S. 609 (1965), that it is unconstitutional for a prosecutor to comment on a criminal defendant's failure to testify.  In <u>Griffin</u>, the prosecution encouraged the jury to draw adverse inferences from the defendant's failure to testify.  <u>Id.</u> at 610.  The Court found that such comments violated the defendant's Fifth Amendment right against self-incrimination.  <u>Id.</u>  In <u>DePew v. Anderson</u>, 311 F.3d 742 (6th Cir. 2003), the Sixth Circuit reversed a habeas petitioner's criminal conviction because the prosecution unfairly commented that the defendant's unsworn testimony was not subject to cross examination.  The <u>DePew</u> Court granted habeas relief because it found that the Ohio Supreme Court had failed to utilize the "harmless error" test reserved for prosecutorial misconduct claims and had instead, upheld the conviction solely because of the brutal nature of the crime. *Id.*

Since <u>DePew</u>, however, the Sixth Circuit has held that a prosecutor's comments on a petitioner's failure to testify do not *always* run afoul of the Fifth Amendment.  In <u>Bowling v. Parker</u>, 344 F.3d 487 (6th Cir. 2003), the prosecutor stated during closing arguments: [w]e have proven to you that he had a motive. We can't tell you what it is, because only the man that pulled the trigger knows. But we know

that there is one." Id. at 514. Utilizing a "flagrancy" test similar to that of Boyle, the Bowling Court found that the prosecutor's comments did not create constitutional error. The Court opined that the comments only marginally touched on the petitioner's silence and, thus, did not mandate a new trial. Id. Additionally, in Joseph v. Coyle, 469 F.3d 441, 474 (6th Cir. 2006), the Sixth Circuit held that a prosecutor's statement that evidence was "uncontroverted from the witness stand" was not an unfair comment on the petitioner's failure to testify because other witnesses could have contradicted the evidence, the comment was not flagrant or repeated, and the trial court instructed the jury about the petitioner's right not to testify. Id.

Subjecting the prosecutor's comments in Smith's trial to the Boyle and Bowling tests outlined above, the Court finds that Smith cannot establish a successful prosecutorial comment on silence claim. During closing argument the prosecutor made the following statement: "Did [Smith] claim accident, that he didn't do this on purpose?" The Sixth Circuit has stated that, when reviewing challenges to a prosecutor's remarks at trial, the court must first consider whether the prosecutor's remarks were improper and then weigh the four Boyle factors in determining whether the impropriety was flagrant enough to warrant reversal. United States v. Carroll, 236 F.3d 777, 783 (6th Cir. 2001).

The Ohio Supreme Court found that the prosecutor's comments, taken in context, were "merely pointing out the defendant to the jury as a means of emphasizing that it was he who committed these heinous crimes." State v. Smith, 780 N.E.2d at 233. The Ohio Supreme Court also found that the prosecutor was only emphasizing how the evidence supported the conclusion that Smith purposely committed the crimes in question. Id. at 233-234. There are many ways to point out a defendant to the jury, or to argue that the defendant purposely committed the crimes in question, that do not include comment on his failure to testify, however. Clearly, the prosecutor's statement ("[d]id he claim

accident, that he didn't do this on purpose?") was a direct comment on Smith's failure to testify, and it is likely the jury understood the comment to have been offered for that purpose.  As such, it was improper.

Having determined that this comment was improper, the Court must now consider the following four factors to determine whether the improper statements were so flagrant as to warrant reversal: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. Carter, 326 F.3d at 783; see also Boyle, 201 F.3d at 717.  When reviewing a prosecutor's remarks at trial, the Court examines the remarks within the context of the trial to make a determination of whether the remarks amounted to prejudicial error. Id.  Again, it "is not enough that the remarks were undesirable or even universally condemned" as the question is whether a prosecutor's remarks "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181.

### i. The Prosecutor's Remarks Tended to Mislead the Jury

As noted above, the Court finds that the prosecutor's comment that Smith failed to claim accident was, in fact, intended to reflect on Smith's silence, or would lead a reasonable juror to interpret them as such.  The prosecutor's comment here can be distinguished from those in Bowling and Joseph because the remarks related *directly* to Smith's failure to testify regarding how Autumn's death occurred.  This is evident by the prosecutor's use of the phrase "does he claim"?? when referencing Smith's defense during closing arguments.  No other defense witnesses could have testified regarding Smith's motive for killing Autumn, moreover.  Additionally, the trial court failed to provide a prompt,

curative instruction in response to the prosecutor's statements.  The Court, therefore, finds there is a strong likelihood that the prosecutor's remarks misled the jury into believing that Smith had some obligation or burden to explain his motives to them.

### ii. The Prosecutor's Remarks Were  Arguably Extensive

The Court must next determine whether the improper comments by the prosecutor were extensive, as opposed to isolated comments not likely to effect the outcome of the trial.  In making this assessment, however, the Sixth Circuit has found that a <u>single</u> comment can remind a jury that the defendant did not testify, and fix in the minds of the juror's the impermissible inference that the defendant is guilty simply because he exercised his right not to testify.  <u>Eberhardt v. Bordenkircher</u>, 605 F.2d 275, 279-280 (6th Cir. 1979) (finding that even a "[r]elatively brief and [un]repeated comment" may have a prejudicial effect if a judge does not give a strong and timely curative instruction).

While  the petitioner here only points to this one comment on the exercise of his right not to testify, the context in which it was made, and the absence of an immediate curative instruction, is arguably sufficient to qualify as the type of isolated comment that, even standing alone, is sufficiently flagrant to satisfy this prong of the <u>Boyle</u> test.  Because the Court finds that at least one other aspect of that test can not be satisfied, however, the Court declines to reach the question of whether, in the absence of any  similar comments by the prosecutor, this one statement could on its own merit habeas relief.

### iii. The Prosecutor's Remarks Were Deliberately Made

This Court also must consider whether the prosecutor deliberately placed the improper comments before the jury. <u>Carter</u>, 236 F.3d at 790. Given the text of the comment, it would be hard to

conclude that it was anything <u>other</u> than deliberate.  <u>See</u>, <u>e.g.</u>, <u>Gall v. Parker</u>, 231 F.3d 265 (6th Cir. 2000).  (finding that when a district court determined that the prosecutor intended to comment on petitioner's failure to testify the jury would understand the statement is being offered for that purpose). Therefore, the Court finds that this aspect of the <u>Boyle</u> flagrancy test is also satisfied.

### iv. The Strength of the Evidence Against Petitioner Was Overwhelming

The Court finds, however, that the final prong of the <u>Boyle</u> test can <u>not</u> be satisfied here.  As noted above, the Court must finally consider the strength of the evidence against the petitioner. <u>Carter</u>, 236 F.3d at 791.  The Court easily finds that the evidence against Smith was overwhelming. Smith was the only individual who was with Autumn immediately before she died and Smith never claimed that he did not cause her death.  Smith asserted a lack of intent as his only defense; all other elements of the crime were conceded.

While there is no clear means to prove intent absent Smith's direct testimony, the evidence the prosecution presented was more than sufficient for a jury to find that Smith intentionally killed Autumn. First, there was evidence that, even when drunk, Smith was in control of his faculties.  Smith's demeanor after police arrived also indicated a recognition of his wrongdoing -- he immediately asserted that he "didn't do it."  Similarly, the jury could fairly conclude that Smith's decision to dispose of the beer cans and diaper shell prior to the arrival of police  were acknowledgments of his guilt and of a desire to hide it.  Finally, as the Ohio Supreme Court found, the ample medical testimony regarding the prolonged nature of the molestation alone supports the conclusion that Smith acted with the requisite intent.

The Court finds that Smith cannot establish that he is entitled to relief.  While the prosecutor's remark during closing argument was improper, that one statement did not permeate the entire trial.  The

-42-

evidence of Smith's guilt was overwhelming, moreover.  Thus, he is hard pressed to demonstrate that the prosecutor's comment prejudiced the outcome of his trial.  Smith definitely cannot show that the "prosecutors comment 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181.  Finally, although the trial court failed to provide the jury with a curative instruction *immediately* after the prosecutor's comments, it did ultimately inform the jury that it could draw no negative inference from Smith's failure to testify.  Accordingly, Smith cannot sufficiently establish that he was prejudiced by counsel's failure to object to the prosecutor's remark during closing statements.  There is no basis to conclude that, but for this remark by the prosecutor, the jury's decision would have been different.  Smith therefore cannot demonstrate that ineffective assistance of counsel should excuse the procedural default of this claim.  Through this analysis, the Court concomitantly finds that, even if this claim were not defaulted, Smith would not have succeeded on the merits.

### 2. Sub-claim (12) - comment that death was the right decision

Smith also asserts that the prosecutor exceeded his constitutional authority when he told the jury that death was the only appropriate sentence.  During penalty phase closing arguments, the prosecutor told the jury:

> Again, as I told you, it's not going to be an easy job for you to do, but when you listen to what Judge DeWeese tells you about the law you will see that the imposition of the death penalty in this case is the clear choice, and you will be duty bound by the law to make that decision.  That is what the State of Ohio is asking you to do here today, is follow the law and impose the death penalty.  After you have heard all arguments of counsel and after you've had an opportunity to go over all of the evidence in this case with each other, the imposition of the death penalty is the decision that you should come to.  And finally, it is the right decision for you to make.

(Doc. No. 35, at 2501).

As the Sixth Circuit has held, a prosecutor's appeals to act as the community conscience are not per se impermissible. Durr v. Mitchell, 487 F.3d 423, 441 (6th Cir. 2007)(*quoting* Byrd v. Collins, 209 F.3d 486, 538-39 (6th Cir. 2000)).  The Sixth Circuit has held, however, that a prosecutor who told the jury to "tell the [defendant] and all of the other drug dealers like her . . . that we don't want that stuff in Northern Kentucky . . . ." constituted error.  United States v. Solivan, 937 F.2d 1146, 1148 (6th Cir. 1991).  Thus, while the Court is hesitant to find that the prosecutor's statement was intrinsically improper, out of an abundance of caution, it subjects it to the four factor test in Boyle to determine whether it was so flagrant as to require habeas relief.

It is clear from the context of the prosecutor's entire closing argument that the statement that death was the "right decision" was a an appeal to the juror's consciences to mete out an appropriate sentence based on some collective sense of morality.   While it was an isolated reference, moreover, when considered in light of the prosecutor's other emotional appeals, it was, at least arguably, sufficiently extensive to satisfy the second Boyle factor.  And, there can be little doubt that it was an intentional, pointed remark.

While the first three flagrancy factors thus appear to militate in favor of granting Smith relief, the Court again finds that the strength of the evidence against Smith, precludes such a conclusion. There was more than enough evidence from which the jury could reach its own decision regarding the punishment to impose in this case.  The Court finds it highly unlikely that the jury was swayed by the prosecutor's personal views on that point, however improper those views may have been.  For these reasons, Smith cannot utilize his claim of ineffective assistance of counsel to excuse the procedural default of this sub-claim, nor could he substantiate such a claim on the merits.

### 3. Remaining Sub-Claims

Given the clearly defaulted status of the remaining sub-claims, the Court declines to further analyze them.  As to the one non-defaulted sub-claim, sub-claim (5), the Court must defer to the trial court, which observed the witness's and jury's demeanor at the time that the CPR doll fell apart, and the conclusion that this occurrence did not inflame the jury against Smith.  See Riley v. Taylor, 277 F.3d 261, 309 (3d Cir. 2001)(*holding* that, habeas court must defer to state trial court on its assessments of juror demeanor and attitude).  Smith's fifth and sixth grounds for relief are not well-taken.

### D. Ninth Ground for Relief - Juror Bias

Smith argues that one of the jurors was predisposed to imposing a death sentence.  In a jury questionnaire, venire member Paula Bryant stated that she was in favor of the death penalty.  In response to questions defense counsel asked her during voir dire, Smith maintains, she revealed that, if she found Smith guilty of the crime, she would impose a death sentence.  Thus, he maintains, her presence on the jury that sentenced him to death was prejudicial.  Smith raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits.  It is therefore not procedurally defaulted.

When defense counsel questioned Bryant about her ability to impose a fair sentence, she stated that she would only impose a death sentence if the defendant's guilt was supported by the evidence adduced during trial.  Defense counsel then queried whether Bryant would favor the death penalty if she already had convicted Smith, as follows:

> Q:   All right.  Well, before the penalty phase ever started, if we get to that phase and before the penalty phase ever started in this case, do you think before it ever started, before there was any more evidence of aggravating circumstances verses mitigating factors, that you would already be leaning toward the death penalty before you heard any of that evidence?

> A:    Before I heard any of the evidence would I lean toward the death penalty?
> Q:    Yes.
> A:    No.
> Q:    So you would make the State prove beyond a reasonable doubt the aggravating circumstances outweighed the mitigating factors?
> A:    Yes.
> Q:    You wouldn't be predisposed before you heard that to impose the death penalty?
> A:    Right.
> Q:    Do you consider the death penalty a serious consequence to a criminal act?
> A:    I think it's a serious consequence, yes, for a serious crime.

(Doc. No. 27, at 793-94).

Defense counsel then objected to Bryant's presence on the jury for cause, stating that she was predisposed toward a death sentence if the jury convicted Smith.    The trial court overruled the objection, reasoning:

> Again, my impression was that she was a believer in the death penalty and I think that concepts of the law were new to her, but I believe she was sincere about being willing to, or she will try to follow the law, and she was saying she would listen to the facts of mitigating and aggravating circumstances or issues, so I'm overruling the motion.

Id. at 794-95.   Smith argues that he is entitled to jurors who will follow the law, rather than merely "try" to follow the law as the trial court suggested.

In Witherspoon v. Illinois, 391 U.S. 510, 521-22 (1968), the United States Supreme Court invalidated a capital sentence when the trial court excused all jurors who expressed a conscientious objection to the death penalty.   The Court reasoned that the proper inquiry was not whether a prospective juror opposed the death penalty generally, but whether the juror's religious, moral, or philosophical beliefs would prevent him or her from following the court's instructions.   Id. at 514 n.7 ("[E]ven a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the laws of the State.").

-46-

The Court revisited this issue after lower court confusion about how to apply the <u>Witherspoon</u> standard, determining:

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.  The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

<u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980); <u>see also</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985)(affirming the <u>Adams</u> standard).  Given the subjective nature of any such determination, the Court cautioned that "deference must be paid to the trial judge who sees and hears the juror." <u>Witt</u>, 469 U.S. at 426.

In <u>Morgan v. Illinois</u>, 504 U.S. 719 (1992), the Supreme Court reviewed a so-called "reverse <u>Witherspoon</u>" case in which it determined that a trial court must excuse for cause any juror who would automatically impose the death penalty.  The <u>Morgan</u> Court concluded that "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." <u>Id.</u> at 738.   Thus, the Court instructed trial courts that, regardless of a juror's personal beliefs, the juror must be able to follow the law to ensure a defendant's right to a fair trial.

<u>Witherspoon</u> and <u>Morgan</u> demonstrate that part of the criminal defendant's right to a fair trial includes his or her right to a jury that is not immutably predisposed in its sentencing decision. Acknowledging this precedent, the Supreme Court recently held that a habeas court must give much deference to the trial court's determination regarding whether a prospective juror is qualified to serve

because it is in the best position to perceive a juror's demeanor.  In Uttecht v. Brown, – U.S. – , 127 S.Ct. 2218 (2007), the Court held that the trial court properly excused for cause a juror who equivocated about his ability to impose the death penalty and appeared at times confused about the law.  Although the Uttecht Court recognized that deference to a trial court "does not foreclose the possibility that a reviewing court may reverse the trial court's decision [to excuse a juror for cause] where the record discloses no basis for a finding of substantial impairment," it held that when "there is lengthy questioning of a prospective juror and the trial court has supervised diligent and thoughtful voir dire, the trial court has broad discretion."  Id. at 2230.

The Ohio Supreme Court found that the trial court in Smith's case did not abuse its discretion. In denying these claims on direct appeal, the Ohio Supreme Court utilized the above precedent:

> The standard for determining whether a prospective juror may be excluded for cause based upon his or her views on the death penalty is whether those views would " prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (Emphasis omitted.) Wainwright v. Witt (1985), 469 U.S. 412, 420 quoting Adams v. Texas (1980), 448 U.S. 38, 45. In this case, juror Bryant indicated that she favored the death penalty. However, she later stated that she would listen to all of the evidence and that she would not be predisposed to recommending the death penalty. Instead, she would make the state prove that the aggravating circumstances outweighed the mitigating factors. Since the juror agreed to follow the law, we find that the trial court did not abuse its discretion in denying Smith's challenge for cause.

State v. Smith, 780 N.E.2d at 230.

The Ohio Supreme Court did not unreasonably apply Wainwright or Morgan in its findings. While Juror Bryant initially appeared to favor a death sentence upon finding the proof required for conviction, once defense counsel explained the weighing of evidence she must perform in the sentencing phase of trial, she appeared willing to follow the law.  Thus, the Court cannot find, as it must to grant Smith relief, that the Ohio Supreme Court's decision was an unreasonable application of the

-48-

Morgan holding.

Finally, the Court distinguishes this case from White v. Mitchell, 431 F.3d 517 (6th Cir. 2005). In that case, the Sixth Circuit held that a juror who had been exposed to media publicity regarding the case was not impartial, denying the petitioner the right to a fundamentally fair trial.  There, the juror, who equivocated several times regarding her ability to fairly decide the case, also stated that, "if the facts prove that [the defendant] is guilty," she would have a "strong belief" regarding the appropriateness of the death penalty.  Id. at 540.  The Sixth Circuit held that, given the juror's repeated self-expressed doubts about whether she could be fair in rendering a sentencing verdict, her presence on the penalty phase jury had a substantial influence on the outcome of that portion of the trial.  Id. at 542.  In the instant case, Bryant expressed no such misgivings about her ability to put aside any personal beliefs and abide by the law as provided to her.  The Morgan holding requires nothing further.  Smith's ninth ground for relief is not well-taken.

### E. Twelfth Ground for Relief - Death Penalty Unconstitutionally Vague[9]

In this ground for relief, Smith contends that the death penalty is unconstitutional because it is vague.  He maintains that the death penalty statutes permit the sentencer to weigh the nature and circumstances of the offense as an aggravating circumstance, even though it only should be considered as a mitigating factor.  While the statutory aggravating circumstances are clearly defined in Ohio Revised Code § 2929.04(A)(1)-(8), he claims that Ohio Revised Code § 2929.03(D)(1), which states that the trier of fact shall consider, inter alia, "testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing,"

---

[9]     Although Smith asserted in ground for relief fourteen that death by lethal injection was unconstitutional, Smith withdrew this claim in the traverse.  (Doc. No. 40, at 168). Accordingly, the Court will not address it in its Opinion.

eviscerates the limitations on evidence that the sentencer is permitted to review favoring a death sentence.  Although Smith raised this claim on direct appeal, the Ohio Supreme Court addressed it in summary fashion.  State v. Smith, 780 N.E.2d 221, 227-28 (Ohio 2002).  Thus, this Court conducts a de novo review of the claim.  See Clinkscale v. Carter, 375 F.3d 430, 436 (6th Cir. 2004)(*holding* that, when a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply).

This claim cannot prevail.  The United States Supreme Court has held that, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" Tuilaepa v. California, 512 U.S. 967, 979-80 (1994)(*quoting* Zent v. Stephens, 462 U.S. 862, 875 (1983))(further citations omitted).  Thus, because Ohio's death penalty scheme requires that the fact finder limit those eligible for the death penalty by requiring it to find the existence of at least one aggravating circumstance set forth in § 2929.04(A) during the culpability phase of trial, the Ohio scheme complies with the constitutional requirements as proscribed by the Supreme Court.

### F. Thirteenth Ground for Relief - Ineffective Assistance of Counsel

In Smith's final ground, he asserts that his counsel were ineffective throughout his trial.  He maintains that counsel were constitutionally ineffective on the following fourteen (14) occasions:[10] (1) failed to request a unanimity instruction; (2) failed to request a solitary juror instruction; (3) failed to object when the State moved to re-admit trial evidence during the penalty phase; (4) failed to object to

---

[10]     Although Smith initially asserted sixteen sub-claims in his thirteenth ground for relief, he stated in the traverse that two of these sub-claims were moot because he had used them to assert cause and prejudice to excuse the procedural default of claims that the Respondent subsequently did not allege were procedurally defaulted.  See Doc. No. 40, at 155; 162.

the admission of gruesome photographs; (5) failed to object to repetitive testimony about Autumn's injuries; (6) failed to object to testimony regarding emergency personnel's attempts to save Autumn's life; (7) failed to object to testimony from doctors regarding Autumn's cause of death; (8) mentioned mitigating factors that were not applicable; (9) failed to object to prosecutorial misconduct; (10) failed to object to the trial court's instruction regarding Smith's failure to testify; (11) failed to object to inflammatory and repetitive testimony regarding Autumn's injuries; (12) failed to object to Frye's testimony during the sentencing hearing; (13) failed to investigate and present mitigating evidence; (14) labored under a conflict of interest because one of Smith's trial attorneys represented Frye's cousin during the time he represented Smith.

As noted previously, to assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  Second, the petitioner must show that he or she was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

A petitioner must point to specific errors in counsel's performance. United States v. Cronic, 466 U.S. 648, 666 (1984).  Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. Id. at 689.  "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort

-51-

[must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Cone v. Bell, 535 U.S. 685, 698 (2002)(*quoting* Strickland, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

Of Smith's fourteen sub-claims, the Court addresses all but three of them as distinct claims elsewhere in this Opinion and finds them to be without merit. Because Smith cannot establish, as he must pursuant to Strickland, that he was prejudiced by counsel's performance, the Court finds sub-claims (3), (4), (5), (6), (7), (9), (10), (11), and (12) to be without merit.[11] See Lundgren v. Mitchell, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.") (*quoting* Strickland, 466 U.S. at 697).

### 1. Sub-claims (1) and (2) – Unanimity and Solitary Juror Instructions

Although the Court also has addressed the underlying merits of sub-claims (1) and (2) – the unanimity instruction and lack of a solitary juror instruction – elsewhere in its Opinion, it finds it necessary to address these claims at this juncture because they were the subject of Court-granted discovery during this habeas proceeding. This claim is not procedurally defaulted because Smith raised

---

[11]     Specifically, the Court addressed the underlying issues of sub-claims (3)-(7) in grounds for relief four, six, and eight.  The Court reviewed the issue raised in sub-claim (9) when addressing ground for relief five.  It addressed the underlying issue raised in sub-claim (10) when it reviewed the third ground for relief.  Finally, the Court addressed underlying issue that is the subject of sub-claim (11) in the sixth ground for relief and the issue raised in sub-claim (12) in the eleventh ground for relief.

it to the Ohio Supreme Court on direct appeal, which summarily addressed it on the merits.

During trial counsel's habeas depositions, both stated that they were unaware of the pivotal Ohio Supreme Court case State v. Brooks, 661 N.E.2d 1030 (Ohio 1996).  As explained above, in that opinion the Ohio Supreme Court held that a trial court should inform a capital jury that a solitary juror could prevent a death sentence.  Trial counsel Bernie Davis did not recall the Brooks case or reviewing it prior to Smith's trial.  When asked whether or not a Brooks-type instruction would be something he might have requested to aid his client, Davis responded, "After looking at Brooks do you want to know what I think?  I think I missed it.  That's what I think.  I missed it, period.  It's a screw up."  (Doc. No. 51, at 34).  When asked whether there could be a reason why he would not have requested a Brooks instruction, Robert Whitney responded similarly.  (Doc. No. 50, at 19).

Smith's trial occurred approximately three years after the Ohio Supreme Court issued its opinion in Brooks.  Because it is reasonable to expect that trial counsel in a capital case should be aware of current Ohio Supreme Court opinions that could affect the outcome of a capital trial, defense counsel's ignorance of the Brooks case was objectively unreasonable.  The instruction the trial court provided to the jury, however, as the Court opined above, was not unconstitutional.  Thus, notwithstanding counsel's failure to request that the trial court charge the jury as it was directed to do pursuant to Brooks, the Court cannot find, as it must for Smith to succeed on this claim, that counsel's failure to act prejudiced the outcome of his trial.  Strickland, at 691-92.  Accordingly, sub-claims (1) and (2) are

not well-taken.[12]

### 2. Sub-claim (8) - mitigating factors not applicable

In this sub-claim, Smith complains because counsel listed several mitigating factors during opening arguments of the penalty phase that were not applicable to him.  He raised this issue on direct appeal to the Ohio Supreme Court and it is therefore preserved for federal habeas review.

When describing the mitigating factors in opening statements, counsel reviewed the seven mitigating factors enumerated in Ohio Revised Code § 2929.04(B)(1)-(7) and described them as follows:

> Now we come to mitigating factors, and the law will tell you that the jury shall consider and also weigh against the aggravating circumstances the nature and circumstances of the offense, the history, character, and background of the offender, Steve, and all of the following factors which are set out in the law, and those I believe are seven in number, one being whether the victim of the offence induced or facilitated it, whether it is unlikely the offense would be committed but for the fact the offender was under duress, or strong provocation; whether at the time of committing the offense the offender because of an inability to detect, or otherwise lacked substantial capacity to understand the criminal nature of the offender's conduct or to conform the offender's conduct to the requirements of the law.
>
> You can also consider the youth of the offender, Steve's lack of a significant prior criminal convictions and delinquency adjudications.  Number 6 is listed under

---

[12]     Smith argues in his traverse that the Ohio Supreme Court employed an erroneous standard in reviewing this claim.  In finding that the claim lacks merit, the Ohio Supreme Court observed that it had found no plain error when reviewing the distinct jury instruction claim.  Smith, 780 N.E.2d at 235.  Smith argues that the plain error standard the court utilized to review the jury instruction claim is not the same standard it was required to use to find prejudice pursuant to Strickland.  While this may be the case, the Court will not alter its decision based on this language. Although the use of a plain error standard may be an incorrect application of the second prong of the Strickland test, it was not an unreasonable application of it.  See Williams v. Taylor, 529 U.S. 362, 410 (2000)("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.")(emphasis in original).  Moreover, given the Ohio Supreme Court's extensive review of the jury instruction and its finding that the instruction was not constitutionally infirm, this Court declines to further address the issue.

-54-

those circumstances, and does not apply in this case because Steve has already been
found by you to have been the principle offender.  Number 7 listed in the mitigating
factors are any other factors that are relevant to the issue of whether the offender should
be sentenced to death.

(Doc. No. 34, at 2235-2236).

On direct appeal, the Ohio Supreme Court found that counsel's listing of irrelevant mitigating
factors did not render counsel ineffective.  It held that, although counsel enumerated all of the mitigating
factors during the opening statement, counsel focused in on only those mitigating factors that were
pertinent to Smith during closing statements.  Thus, the court held, counsel's actions were not
objectively unreasonable to Smith's prejudice.

The Ohio Supreme Court's opinion on this issue is not an unreasonable one.  While it may not
have been necessary to review all the mitigating factors, including inapplicable factors to the jury,
counsel's underscoring of the relevant mitigating factors at the end of the penalty phase directed the
jury's attention to those factors just prior to their deliberations.  Moreover, Smith cannot demonstrate
that the listing of mitigating factors was prejudicial to the outcome of his mitigation hearing.  This claim
is not well-taken.

### 3. Sub-claim (13) - failure to investigate and present mitigating evidence

Smith contends that counsel failed to discover and introduce evidence that he *may* suffer from
low serotonin levels and that low serotonin levels *may* adversely affect behaviors.  He claims that the
introduction of this evidence might have persuaded the jury to spare him the death sentence.  Smith
raised this claim in his post-conviction petition, the first point of his state-court appeals at which he
could do so.  Thus, it is not procedurally defaulted.

The United States Supreme Court has expounded on the Strickland standard relative to claims

-55-

that trial counsel failed to investigate and present mitigating evidence regarding a defendant's background.  In Wiggins v. Smith, 539 U.S. 510 (2003), the Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[13]  The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to Strickland.

The Wiggins Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.   While Strickland established that strategic decisions generally are not subject to challenge, the Wiggins Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  Id.   Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under Strickland.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must

---

[13]     The Court noted the extensive hardships the petitioner faced during childhood:
> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.   . . . Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.

Id. at 516-7 (citations omitted).

determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Rompilla v. Beard, 545 U.S. 374, 376 (2005)(internal quotation marks and citations omitted); Dickerson v. Bagley, 453 F.3d 690 (6th Cir. 2006).

Smith argued before the post-conviction appellate court that low serotonin levels inhibit one's ability to control impulsive behavior and is commonly present in type-2 alcoholics. That court rejected Smith's claim, finding that Smith did not present evidence that he in fact suffered from this defect and that, because the effects of low serotonin were too speculative, it could not find counsel's failure to investigate this issue was objectively unreasonable. (Doc. No. 21, at 140).

This Court also found that Smith could not demonstrate the "good cause" necessary to obtain discovery on this issue in this habeas litigation. It opined in its Order denying Smith discovery on this issue:

> Smith did not proffer evidence to the state court that he does, in fact, suffer from low serotonin levels. Thus, any assertion that counsel were ineffective for failing to present this evidence is based on the purely speculative theory that Smith suffers from this deficiency. Moreover, Smith's state post-conviction expert did not aver that the scientific research linking low serotonin levels with violent behavior is accepted by the scientific community. Consequently, it is speculative whether counsel's efforts to introduce any such evidence would have been successful. Accordingly, the Court finds that no good cause exists to depose trial counsel on this issue.

(Doc. No. 46, at 4). As is apparent from the reasoning set forth in this Court's prior Order, the Court finds that the post-conviction court did not unreasonably apply Strickland, and Wiggins, in finding that counsel were not ineffective for failing to investigate and present evidence of a connection between low

serotonin levels and behavior where there is no evidence Smith suffers from that condition.[14]

    **4.**    **Sub-claim (14) - counsel conflict of interest**

    In Smith's final ineffective assistance claim, he argues that counsel labored under a conflict of interest during his representation of Smith at trial.  While representing Smith, defense counsel Whitney also represented Matthew Frye, a relative of the victim, in another matter.  Smith asserts that, although Frye may have been a defense witness during mitigation, Whitney's representation of Frye and his desire to procure a good result for his client in that matter may have influenced Whitney not to call Frye to testify on Smith's behalf.

    In its opinion dismissing this claim, the appellate court found on Smith's appeal from post-conviction review that Smith failed to raise this issue during trial and therefore had to demonstrate "an actual conflict of interest adversely affected defense counsel's performance."  (Doc. No. 21, at 149)(*citing* State v. Boyle, 00-CA-34, slip op. (Ohio Ct. App. Oct. 6, 2000)(further citations omitted).  It then found that Smith failed to so demonstrate:

> First, appellant has not shown an actual conflict of interest existed.  Appellant has presented no evidence that there was a close relationship between Mr. Frye and the victim so as to create a real conflict of interest and the family relationship is not direct.  Furthermore, even if we were to decide that a conflict of interest of constitutional proportions did exist, which we do not find, appellant has failed to argue or show how

---

[14]    Smith asserts in the traverse that the use of low serotonin levels proved successful in another case before the Ohio courts.  He cites to State v. Sanders, No. 17718, 2000 WL 1006574 (Ohio Ct. App. July 21, 2000), for the proposition that low serotonin levels can be persuasive evidence in a sentencing decision.  That case, however, is easily distinguishable.  There, the defendant who was charged with non-capital aggravated murder cited the fact that he suffered from low serotonin levels and bipolar disorder, as evidence to support his claim that the trial court erred when it failed to charge the jury on voluntary manslaughter. Because that defendant, unlike Smith, was diagnosed with a serious mental illness, and because the record in that case *supported* his assertion regarding his serotonin levels, the Sanders case cannot support Smith's claim that, the mere assertion that one may suffer from low serotonin levels, by itself, is recognized by the Ohio courts as mitigatory evidence.

an act or omission of appellant's counsel at trial resulted in prejudice to appellant. Id.

As with the above sub-claim, this Court found no "good cause" to depose trial counsel on this issue based on the reasoning of the court of appeals:

> The Court finds no good cause to depose Whitney regarding a potential conflict of interest based on his representation of Frye. Smith does not reveal in the Motion the nature of his relationship with Frye or why he believes that Frye would have been a beneficial defense witness during mitigation. Without providing this basic information, the Court cannot grant discovery on this issue. Smith's first request is denied.

(Doc. No. 46, at 3). Smith cannot demonstrate that an actual conflict existed or, as stated above, if counsel were unreasonable in their continued representation of him, how he was prejudiced by the conflicted representation. Because Smith cannot demonstrate that the Ohio Court of Appeals' decision is contrary to or an unreasonable application of any United States Supreme Court precedent, this sub-claim is not well-taken.


## VIII. CONCLUSION

The Court now must determine whether to grant a Certificate of Appealability (hereinafter "COA") for any of Smith's claims. In two decisions, the Sixth Circuit determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." Porterfield v. Bell, 258 F.3d 484, 487 (6th Cir. 2001); see also Murphy v. Ohio, 263 F.3d 466 (6th Cir. 2001)(remanding motion for COA for district court's analysis of claims). Thus, in concluding this Opinion, this Court now must consider whether to grant a COA

as to any of the claims Smith presented in his petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes,

requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between

the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a

<u>constitutional</u> right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre-

and post-AEDPA versions of that statute in <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  In that case, the

Court held that § 2253 was a codification of the standard it set forth in <u>Barefoot v. Estelle</u>, 463 U.S. 880

(1983), but for the substitution of the word "constitutional" for "federal" in the statute.  <u>Slack</u>, 529 U.S.

483.  Thus, the Court determined that :

"[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

<u>Id.</u> at 483–04 (*quoting* <u>Barefoot</u>, 463 U.S. at 893 n.4).  The Supreme Court has opined that, to obtain

a COA a prisoner must prove " 'something more than the absence of frivolity' " or more than "good

faith" regarding a particular claim.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003)(*quoting* <u>Barefoot</u>,

-60-

463 U.S. at 893).  The <u>Miller-El</u> Court clarified that a petitioner need not prove that some jurists would grant habeas relief on a claim in order to obtain a COA on that issue because, as it reasoned, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  <u>Id.</u>

The type of analysis this Court must perform depends on the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  <u>Slack</u>, 527 U.S. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right <u>and</u> that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Id.</u>  (emphasis supplied).

After taking the above standard into consideration, the Court finds that four issues arguably merit further review.  The Court will address each issue and its procedural status below.

The Court will not issue a COA for grounds for relief 3, 6, and 11 (trial court comment on Smith's failure to testify, State's use of inflammatory evidence, and use of victim impact evidence, respectively) or for all but sub-claim (7) of claim 5 (prosecutorial misconduct).  These claims are unequivocally procedurally defaulted because Smith failed to object to the grounds for each claim during trial and the Ohio Supreme Court reviewed them for plain error.  Thus, their defaulted status is

not debatable among jurists of reason.[15]

Reasonable jurists would find that this Court's decision to deny grounds for relief 1 and 2 (lesser-included defense instruction, voluntary manslaughter instruction, and voluntary intoxication instruction) is also not debatable.  The trial court's reasoning on this issue, and the Ohio Supreme Court's adoption of it, does not run afoul of any United States Supreme Court precedent and is consistent with Ohio law on these issues.  Thus, no COA will issue for these grounds.

Similarly, no COA will issue for ground for relief 4 (gruesome photographs).  As stated above, the Court finds that the Ohio Supreme Court's finding that the admission of several photographs and slides of the victim was probative of the elements the State had to prove was not an unreasonable finding.  No jurist of reason would disagree.

For the reasons articulated in analyzing that issue, the Court finds that reasonable jurists could debate both the defaulted status and the merits of subclaim 7 of claim 5 -- relating to the prosecutor's comment on Smith's silence.  While this Court has no doubt regarding the overwhelming nature of the evidence of Smith's guilt, other jurists might disagree. Since that was the sole flagrancy factor upon which this Court's ruling on this subclaim hinged, accordingly, this Court grants a COA on that subclaim.

The Court finds that reasonable jurists could also debate both the defaulted status and the merits of this Court's findings on ground for relief 7 (unanimity instruction).  While the Court found that this claim is procedurally defaulted because Smith acknowledged in his appellate brief that the claim was

---

15      Although the Court found that one sub-claim of Smith's prosecutorial misconduct claims – the prosecution's use of a doll that fell apart during its medical witness's "shaken baby" demonstration – was not procedurally defaulted, it does not warrant a COA.  As the Court explained above, the trial court, which was in the best position to observe the effect of this incident on the jury's demeanor, determined that Smith was not prejudiced by it.

subject to plain error review, the Ohio Supreme Court's opinion was silent on the type of review under which it analyzed the claim. Thus, it could have excused Smith's failure to contemporaneously object and addressed the full merits of the claim. Accordingly, the Court finds that jurists of reason could debate the defaulted status of Smith's fourth ground for relief.

Reasonable jurists also could debate whether this claim has merit. While the Court found that, because the jury instruction the trial court provided in Smith's case was virtually identical to the jury instruction provided in the Hartman case, Smith's claim could not be well-taken, this issue has been the subject of much debate and divergent opinions in the Sixth Circuit. Such variance demonstrates that reasonable jurists could differ on this issue. A COA will issue for ground for relief 7.

The Court will not issue a COA for ground for relief 8 (state witnesses testified about Smith's intent to kill). As the Court found above, the Ohio Supreme Court's finding, pursuant to State law, that some of the State medical testimony was offered as lay opinion and some supported the element of intent, was not contrary to any United States Supreme Court precedent. Thus, jurists of reason would not find equivocal the Court's decision to deny this claim.

Jurists of reason could not debate the Court's decision to deny ground for relief 9 (juror favoring capital punishment). Unlike the circumstances in White, the juror in question here stated that she could follow the dictates of the law once she became aware of how it must be applied. No COA will issue for this ground.

No COA will issue for ground for relief 10 (trial court remark regarding mitigating evidence). The trial court's question to the prosecution regarding whether they wanted to cross-examine a corrections officer is subject to multiple interpretations and did not deprive Smith of a fair trial. No reasonable jurist would debate the Court's finding.

No COA will issue for claim 12 (unconstitutionality of the death penalty).  The Court will not grant a COA for claims which occur almost pro forma in a capital habeas petition but are routinely denied.

Finally, the Court grants a COA for ground for relief 13, sub-claims (1) and (2) only.  The Court already has found that counsel's ignorance of the Brooks opinion was objectively unreasonable.  Although the Court found that no prejudice inured to Smith based on trial counsel's failure to request a Brooks-type instruction, as stated elsewhere in this COA review, this issue has been debated extensively in the Sixth Circuit.  Thus, the Court finds that jurists of reason could debate the Court's conclusion that the instruction was constitutionally sound pursuant to the Hartman holding.

No other sub-claims of Smith's thirteenth ground warrant a COA.  Most claims were raised and addressed as distinct grounds for relief.  Thus, Smith cannot show he was prejudiced by any of counsel's alleged failures.  Moreover, Smith does not demonstrate, as stated above, that counsel were unreasonable for failing to discover and present evidence of his low serotonin levels or that counsel's representation of one of Frye's relatives resulted in an actual conflict of interest in counsel's representation of him.

Finally, the Court has observed from prior capital habeas cases that counsel for the losing party routinely file a motion for reconsideration.  Counsel are advised that attorneys in capital cases are not immune from sanctions where motions are unfounded or are filed for purely tactical reasons unrelated to the merits of the positions taken therein.  If counsel file a frivolous motion for reconsideration in this, as in any case, they may be required to reimburse the opposing party for the attorneys' fees and expenses incurred in responding to such motions.  See Davie v. Mitchell, 291 F.Supp.2d 573, 634 (N.D. Ohio 2003)(Gwin, J.); Baston v. Bagley, 282 F.Supp.2d 665, 673 (N.D. Ohio 2003)(Carr, C.J.); Haliym

v. Mitchell, No. 1:98CV1703, (slip op.) at 158-59 (N.D. Ohio Jan. 20, 2004)(Polster, J.).  Where

counsel filing an unsuccessful motion for reconsideration are otherwise to be compensated under the

Criminal Justice Act, moreover, counsel may not be compensated for the time expended in preparing

and filing such motions if this Court finds the motion to be frivolous or asserted solely for purposes of

delay.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal in forma pauperis would

not be frivolous and can be taken in good faith.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:** September 27, 2007